UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JEFFREY D. LEISER,

                    Plaintiff,

        v.                                          Case No. 23-cv-2-pp

DANIEL LAVOIE, *et al.*,

                    Defendants.

## ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 62, 67, 81), DENYING PLAINTIFF'S MOTION TO STRIKE (DKT. NO. 115) AND DISMISSING CASE

Plaintiff Jeffrey D. Leiser, who currently is incarcerated at Redgranite Correctional Institution, is representing himself in this 42 U.S.C. §1983 case. On July 13, 2023, the court screened the complaint and allowed the plaintiff to proceed on Eighth Amendment claims based on allegations that, after a new policy reduced the amount of Tylenol the plaintiff could receive each month, the defendants refused to adequately address the resulting pain he suffered. Dkt. No. 6. On August 23, 2024, defendants Dr. Gilbert D. Steffanides and Nurse Jodi Fryczynski each moved separately for summary judgment. Dkt. Nos. 62, 67. Defendants Dr. Daniel LaVoie and Nurses Cindy Barter and Angela Thompson (the State defendants) moved for summary judgment on September 20, 2024. Dkt. No. 81. A few months later, on December 20, 2024, the plaintiff moved to strike the State defendants' responses to his additional proposed findings of fact. Dkt. No. 115. The court will grant defendants'

1

motions for summary judgment, deny the plaintiff's motion to strike and dismiss this case.

## I. **Procedural Issues**

As noted, the State defendants moved for summary judgment on September 20, 2024. Dkt. No. 81. As required by Civil Local Rule 56(b)(1)(C) (E.D. Wis.), the State defendants filed a statement of proposed material facts as to which they contend there is no genuine issue and that entitle them to a judgment as a matter of law. See Dkt. No. 83. The plaintiff timely responded to the State defendants' statement of facts as required by Civil L. R. 56(b)(2)(B), but the clerk's office mistakenly put the wrong document on the docket, leading the State defendants to argue that, under Civil L. R. 56(b)(4), their statement of material facts should be deemed admitted for the purposes of summary judgment. Dkt. No. 114. The court has remedied the error, and the plaintiff's response to the State defendants' statement of proposed material facts now is properly docketed. See Dkt. No. 107. The court will not deem the State defendants' statement of proposed material facts admitted.

In response to the State defendants' motion, the plaintiff filed his own "proposed finding of facts and additional proposed findings of fact," dkt. no. 108, as permitted under Civil L. R. 56(b)(2)(B)(ii). As required by Civil L. R. 56(b)(3)(B), the State defendants filed a reply to the plaintiff's additional facts. Dkt. No. 113. On December 20, 2024, the plaintiff moved to strike the State defendants' reply to his additional facts on the ground that their filing "does not recite th[eir] Proposed Finding of Facts." Dkt. No. 115. The plaintiff's

2

motion is without merit. The State defendants are not replying in support of their *own* statement of facts; they are replying to the *plaintiff's* additional statement of facts. As required, they reproduced each paragraph of the plaintiff's statement of facts before stating their response. The rule does not require the State defendants to reproduce their own statement of facts. The court will deny the plaintiff's motion to strike.

## II.    Factual Background

### A.    <u>The Parties</u>

The plaintiff is, and was during the events described in the complaint, incarcerated at Redgranite Correctional Institution, where Thompson worked as the health services manager, Barter and Fryczynski worked as nurses and Steffanides worked as a primary care physician. Dkt. No. 107 at ¶¶1-3; Dkt. No. 63 at ¶13; Dkt. No. 6. Also during the relevant time, LaVoie worked for the Department of Corrections as the Medical Director. Dkt. No. 107 at ¶4.

### B.    <u>The Over-the-Counter Medication Policy at Issue</u>

The Department of Corrections has a Pharmacy and Therapeutics Committee (the committee) that is responsible for developing the Bureau of Health Services Formulary, which is a list of reviewed and approved medications that medical providers who have the authority to prescribe medication may order for incarcerated patients. Dkt. No. 107 at ¶22. As Medical Director, LaVoie serves as the Chairman of the committee. The co-chair of the committee is the Pharmacy Director, and other members include providers, nurses and pharmacists. <u>Id.</u> at ¶21. The formulary details allowable

3

dosage amounts, packaging type, whether the medication is required to be security controlled and other criteria, such as intended use, required trials or limits on the amount allowed in a given period. Id. at ¶23.

The committee monitors and evaluates the prescription patterns within the Department of Adult Institutions to ensure that the medications prescribed and available to incarcerated individuals are safe and effective for their intended use. Dkt. No. 107 at ¶28. In reviewing the prescribed medications, the committee found that many incarcerated individuals had a large number of medications ordered by providers for a year at a time with very high limits that were beyond the recommended limits for chronic use. Id. at ¶29.

Relevant to this lawsuit is the medication acetaminophen (commonly referred to by the brand name Tylenol), which can be prescribed by a provider or purchased by an incarcerated individual "over the counter" at canteen. Id. at ¶¶24-27. Chronic use of more than 3,000 mg of Tylenol per day is not recommended based on literature and expert opinion; such use may produce adverse health effects, specifically liver damage. Id. 107 at ¶31; Dkt. No. 96 at ¶23. Because providers do not monitor or document the medications that incarcerated individuals purchase at canteen, the committee pointed out the potential risk of high prescriptive limits combined with canteen purchases of the same medication. Dkt. No. 107 at ¶26, 32-33.

In addition to the health concerns posed by chronic use of high dosages of Tylenol, having excessive amounts of medication available to incarcerated individuals makes overdose opportunities greater. Dkt. No. 107 at ¶34. And

abuse of any drug is common in the prison setting. Id. Having loose restrictions

on medications can cause negative health effects and is a cause for concern. Id.

With the foregoing considerations in mind, the committee determined

that there was a need to implement limits on prescriptions for over-the-counter

medications, including Tylenol, to ensure that providers prescribed the

medications safely and that incarcerated individuals used the medication

safely. Dkt. No. 107 at ¶35. The committee also wanted to further align the

practice in the institutions with community standards, which included

avoiding chronic use of medications, allowing access to medications only as

necessary and not in excess and avoiding the risk of potential negative health

effects posed by medications. Id. at ¶36.

To this end, on April 6, 2022, LaVoie, as chairperson of the committee,

distributed a memo throughout the Department of Adult Institutions informing

staff of the new over-the-counter medication limits. Dkt. No. 107 at ¶¶37-38.

The memo included a chart of all impacted medications and explained that the

new policy was effective as of April 4, 2022—two days prior to the date on the

memo. Id. at ¶39. Tylenol was one of the impacted medications. Prior to the

policy change, providers could prescribe up to eight, 500 mg tablets per day,

for a total of 4,000 mg per day (or up to 240 tablets every 30 days). Dkt. No. 68

at ¶25; Dkt. No. 96 at ¶23. Under the new policy, providers could prescribe a

maximum of fifty tablets every thirty days, with an active prescription duration

of ninety days. Dkt. No. 107 at ¶40; Dkt. No. 63 at ¶¶22-23. Per the policy, on

an individual basis, providers could request higher prescriptions for over-the-

counter medications if the provider determined that a particular person needed it based on that person's individual condition. Dkt. No. 107 at ¶42. The policy did not impact incarcerated individuals' ability to purchase over-the-counter medications, including Tylenol, from canteen; it impacted only prescriptions for those medications. Dkt. No. 107 at ¶¶44-45; Dkt. No. 63 at ¶25.

C.  Plaintiff's Tylenol Use

According to the plaintiff, prior to the new policy, a provider had prescribed him two, 500 mg tablets of Tylenol three times per day as needed (or up to 180 tablets every thirty days), for complaints of pain related to a nerve impingement in his spine.[1] Dkt. No. 96 at ¶13; Dkt. No. 113 at ¶23; Dkt. No. 101 at ¶15. The parties do not state who originally entered this prescription or how long the plaintiff had been taking Tylenol at this dosage level. On April 12, 2022 (six days after LaVoie distributed the memo regarding the new policy), Steffanides saw the plaintiff for the first time for complaints of right knee pain. Dkt. No. 100 at ¶27. According to the plaintiff, he also complained of back pain, but Steffanides told him they would take care of the knee pain first and then address the back pain. Id. Steffanides asserts that the plaintiff represented that he received little relief from Tylenol, ibuprofen or laying down. Id. at ¶28. Steffanides prescribed a Medrol Dosepak for the knee pain and ordered an x-ray. Id. at ¶30. They also discussed having a follow-up

_____

[1] On the one hand, the plaintiff asserts that Tylenol effectively addressed his pain. On the other, he asserts that Tylenol "is for MINOR ACHES AND PAINS, NOT FOR SEVERE SPINAL NERVE IMPINGEMENT/PAIN." He also asserts that it is the "cure-all pain medication and is handed out to everyone in severe pain." Dkt. No. 96 at ¶¶19, 23; Dkt. No. 113 at ¶21.

appointment to discuss the x-ray results and determine whether an injection or a referral to an orthopedic specialist may be appropriate. <u>Id.</u> at ¶31.

A few days later, on April 15, 2022, the plaintiff attempted to reorder Tylenol consistent with his prescription for two, 500 mg tablets three times per day. Dkt. No. 113 at ¶3. His order was denied two days later, on April 17, 2022. <u>Id.</u> The plaintiff asserts that this is the first time he learned of the new policy and the impact on his prescription.[2] <u>Id.</u>

The parties' submissions are not entirely clear on this point, but it appears that on the day staff denied his reorder, the plaintiff wrote a letter to LaVoie to complain about the policy change. Dkt. No. 113 at ¶37; Dkt. No. 107 at ¶63. LaVoie asserts that he did not receive the plaintiff's letter, but says that if he had received it, he would have directed the plaintiff to contact his provider so that his provider could determine whether an exception to the policy would be appropriate. Dkt. No. 107 at ¶¶63-64. That same day, the plaintiff also submitted a health services request directed to Health Services Manager Thompson, explaining that he had tried to reorder his Tylenol prescription but that medical staff had informed him that a new policy limited him to fifty tablets per month, so he could not reorder Tylenol until April 23, 2022. Dkt. No. 107 at ¶67. Per the health services unit practice (<u>see</u> Dkt. No. 107 at ¶¶12-14; Dkt. No. 96 at ¶¶40-57), a nurse triaged the plaintiff's health services

---

[2] The plaintiff also asserts that at the April 12, 2022 appointment, five days *before* staff denied his refill order and he learned of the policy change, he informed Steffanides that he needed more Tylenol than allowed under the new policy. Dkt. No. 100 at ¶28. Both of these assertions cannot be true.

request and referred it to Thompson. Dkt. No. 107 at ¶68. Two days later, on April 19, 2022, Thompson responded to the health services request and informed the plaintiff that he could purchase medication from canteen. Id.

On April 20, 2022 (the day after the plaintiff received Thompson's response), the plaintiff submitted a second health services request complaining that he was in pain because of the new policy limits on Tylenol. Dkt. No. 107 at ¶71; Dkt. No. 113 at ¶44. The next day, Nurse Barter responded to the plaintiff's health service request by providing him with a memo explaining the new policy and with his medication list. Dkt. No. 107 at ¶72. She also informed the plaintiff that the health services unit was not required to replace the Tylenol, and she instructed the plaintiff to use all forms of pain management in his plan of care and to discuss his concerns at his next advanced care provider appointment, which tentatively was scheduled for June 10, 2022. Id.; Dkt. No. 84-1 at 15. Barter also referred the health services request to Thompson for review, who responded the next day, on April 22, 2022. Dkt. No. 107 at ¶¶73-74; Dkt. No. 113 at ¶47. Thompson clarified that the change in policy was a directive from the Bureau of Health Services. Dkt. No. 84-1 at 15. Thompson and Barter assert that neither of them had the authority to change the plaintiff's prescription or to override the policy. Dkt. No. 107 at ¶75.

It is not clear why, but about two months later, on June 15, 2022, Thompson sent the plaintiff a letter reminding him that he had been provided with the April 6, 2022 memo summarizing the new medication policy. Dkt. No. 4-1 at 9; Dkt. No. 107 at ¶77-80. She also recounted that the plaintiff had met

with Steffanides on April 15, 2022 and that he had not made any changes to the plaintiff's over-the-counter medication prescriptions. Id. She reminded the plaintiff that he was permitted to supplement any needs he may have by purchasing over-the-counter medications from canteen or from the catalog. Id.

About a week later, on June 23, 2022, Steffanides saw the plaintiff to discuss his right knee x-ray, which showed degenerative joint disease. The plaintiff indicated that he was using Celebrex, Tylenol, ice and rest, but that he would like to try a cortisone injection. Dkt. No. 100 at ¶32. Steffanides administered a cortisone injection and told the plaintiff to continue with his other medications and ice and to follow up as needed. Id. at ¶33. At this appointment, the plaintiff did not ask Steffanides for additional Tylenol, nor did he discuss the Tylenol limits with Steffanides. Id. at ¶34. About a month later, on July 25, 2022, Steffanides ordered muscle rub for the plaintiff, to address complaints of pain that the plaintiff had made to a nurse. Id. at ¶35. And two weeks after that, on August 10, 2022, Steffanides ordered Voltaren gel to address additional complaints of pain that the plaintiff had made to a nurse. Id. at ¶36.

Not long after, on August 23, 2022, the plaintiff submitted another health services request directed to Thompson. Dkt. No. 107 at ¶81. He stated that he was receiving fifty tablets of Tylenol per month, and he acknowledged that he had the opportunity to supplement with medication purchased at canteen, but he notified Thompson that, for the prior three weeks, the canteen had been out of Tylenol. Id. at ¶81; Dkt. No. 4-1 at 10-11. Barter triaged the

health services request and sent it to Thompson for a response. Dkt. No. 107 at ¶82. About a week later, on August 31, 2022, Thompson responded to the health services request, and—without directly addressing the plaintiff's concern—instructed the plaintiff to supplement his medications with canteen medications. Id. at ¶82.

The defendants explain that incarcerated individuals can purchase the following medications at canteen: ibuprofen 200 mg (thirty count), extra strength acetaminophen (Tylenol) 500 mg (fifty count), naproxen tabs 220 mg (fifty count), medi-first 200 mg ibuprofen (limit of twenty-five), medi-first free extra strength acetaminophen 500 mg (limit of twenty-five), Azz non aspirin tablet regular strength 325 mg (fifty count), medique aspirin 325 mg (limit twenty-five), mediproxen 220 mg (naproxen) general Aleve (limit of twenty-five), and mediquie exederil generic Excedrin 250 mg (limit of twenty-five). Dkt. No. 107 at ¶100; Dkt. No. 100 at ¶73. On April 21, June 3, June 23, July 14, August 21, September 7, October 26 and November 2, 2022, the plaintiff ordered and received one bottle of off-brand Tylenol 500 mg (fifty tablets). Dkt. No. 100 at ¶¶74-82. At his deposition, the plaintiff testified that he tried to order Tylenol every other week, but he acknowledged that he could have placed an order every week if he had wanted to. Dkt. No. 66-2 at 8.

On September 1, 2022—a couple of weeks after Thompson responded to the plaintiff's August 23, 2022 health services request—Steffanides ordered Lidocaine topical cream to address complaints of pain that the plaintiff had made to a nurse. Dkt. No. 100 at ¶37. Steffanides examined the plaintiff a little

10

more than a week later, on September 12, 2022, for complaints of back pain. Dkt. No. 100 at ¶38. Steffanides reviewed the plaintiff's records and noted that he had a history of herniated/bulging discs and sciatica. Id. He also noted that the most recent imaging was an MRI taken in 2017. Id. At the appointment, the plaintiff reported that he had experienced a recent flare-up in back pain while exercising, when he heard a pop and felt pain radiating from his lower back, down his leg. Id. at ¶39. The plaintiff explained that he was using ice, heat, Tylenol and Celebrex, but that nothing was helping the pain. Id. at ¶40. Steffanides prescribed a muscle relaxer and a Medrol Dosepak for pain and recommended that the plaintiff keep using NSAIDS, Tylenol, ice and heat. Id. at ¶41. Steffanides planned to have an x-ray and follow up with an MRI in four to six weeks if the plaintiff saw no improvement. Id. Steffanides asserts that the plaintiff did not ask to increase his prescription for Tylenol, but the plaintiff disputes this, asserting that he asked Steffanides to "up the Tylenol along with other medications." Id. at ¶42.

Two weeks later, on September 15, 2022, the plaintiff had an x-ray of his spine. Dkt. No. 100 at ¶43. Steffanides saw the plaintiff about a month later, on October 12, 2022, for complaints of back pain with sciatica. Id. at ¶44. The plaintiff told Steffanides that the medications temporarily helped, but that when they wore off, he was in a lot of pain. Id. Steffanides placed a referral for an MRI and a referral for a visit with pain management after the MRI. Id. at ¶45. He also prescribed a muscle relaxer and Medrol Dosepak for pain and recommended that the plaintiff continue to rest and use ice and heat while he

waited for the MRI. Id. Steffanides asserts that the plaintiff did not ask him at this appointment to increase his Tylenol, but the plaintiff disputes this. Id. at ¶48.

Less than a week after his appointment with Steffanides, on October 17, 2022, the plaintiff submitted a health services request stating:

> When I was seen by the male RN last week for my back, he upped my tylenol to 2 pills 3 times a day.[3] I asked/told him about the 50 pills limit I will be out before order time he said [we] will deal with it then! Well its then and I'm out of tylenol canteens out as well. No[w] what do I do???

Dkt. No. 96 at ¶58. Nurse Fryczynski triaged the health services request the next morning, on October 18, 2022. Dkt. No. 96 at ¶59. She asserts that she interpreted the plaintiff's health services request as a request for information. Id. at ¶61. Fryczynski states that she reviewed the plaintiff's records, which showed that on October 5, 2022, Dr. Rey Palop placed an order for the plaintiff to take two, 500 mg tablets three times per day ("TID"), as needed ("PRN") for pain. Id.; Dkt. No. 103-1 at 2. The order also specified that the prescription was limited to fifty tabs every thirty days. Dkt. No. 103-1 at 2. Fryczynski further noted that the plaintiff's prescription for Tylenol already was at the policy and prescription order threshold. Dkt. No. 96 at ¶62. Fryczynski responded to the health services request by confirming the policy limits on Tylenol and

---

[3] Elsewhere, the plaintiff asserts that "[a]t no time during April 2022-December 2022 no ACP changed Leiser's prescription from 2 tabs 3 times a day. . . . No Doctor re-wrote the prescription to just 50 tabs a month." Dkt. No. 113 at ¶48. Accordingly, it appears that no one "upped" the plaintiff's Tylenol; the provider merely maintained the prescription that was in place.

scheduling the plaintiff to be seen by a provider with the authority to review and adjust his prescription. Id. at ¶¶63-64.

A few weeks later, on November 1, 2022, the plaintiff apparently fell over and heard his back pop. Nurse Bretzel (who is not a defendant) saw him for complaints of pain. Dkt. No. 100 at ¶47. The plaintiff notified her that he was using Tylenol, lidocaine, diclofenac and cyclobenzaprine. Id. Bretzel consulted with Steffanides, who recommended that the plaintiff continue his current prescriptions while he waited for the MRI; Bretzel also gave the plaintiff ice. Id. at ¶48. About two weeks later, on November 18, 2022, Steffanides ordered Voltaren gel to address the plaintiff's complaints of pain, although the plaintiff asserts that he never received the gel from the health services unit. Id. at ¶49. A few days later, on November 22, 2022, Steffanides saw the plaintiff to review the results of recent labs and discuss his ongoing back pain. Dkt. No. 100 at ¶50. The lab results showed mildly elevated ALT and AST, which are liver enzymes. Id. at ¶50. ALT is released into the blood when liver cells are damaged, and AST is a liver enzyme that helps break down amino acids. Id. at ¶51. Steffanides explains that chronic use of Tylenol can lead to elevated ALT and AST levels and over time can cause liver damage. Id. at ¶52.

Also at the November 22, 2022 visit, Steffanides notified the plaintiff that he had an MRI scheduled in December with a subsequent pain management referral to address his back pain. Dkt. No. ¶53. The plaintiff stated at the appointment that he would like to stop Celebrex and try ibuprofen, so Steffanides prescribed ibuprofen and advised the plaintiff to continue his other

13

previously prescribed pain relief measures—including ice, heat and range of motion exercises—while he waited for the MRI. Dkt. No. 100 at ¶54. Steffanides asserts that he also advised the plaintiff to decrease his Tylenol usage given his elevated ALT and AST levels, but the plaintiff denies that Steffanides gave him any such advice. Id. at ¶55. On December 20, 2022, the plaintiff had an MRI of his lower back. Dkt. No. 100 at ¶56.

On December 26, 2022, the plaintiff submitted a health services request asking for his prescription of ibuprofen, which he asserted had been ordered by his provider. Dkt. No. 107 at ¶84. Thompson reviewed the plaintiff's records and confirmed that on November 22, 2022, Steffanides had ordered 800 mg of ibuprofen twice a day, beginning on November 25, 2022 and ending on November 10, 2023. Id. at ¶85. But according to Thompson, the medication order showed that on December 19, 2022, Steffanides had changed the end date of the prescription from November 10, 2023 to December 23, 2022. Id.; see Dkt. No. 84-1 at 5. Thompson asserts that she did not know why the provider changed the end date of the prescription, but that she did not have the authority to override that change. Dkt. No. 107 at ¶87. The plaintiff acknowledges that the order had an end date of December 23, 2022 and suggests that "someone changed it," although he provides no evidence showing who changed it or when that person changed it. Dkt. No. 113 at ¶55.

On December 27, 2022, Thompson responded to the plaintiff's health services request and informed him that he no longer had an active order for ibuprofen. Dkt. No. 107 at ¶88. That same day, the plaintiff submitted another

14

health services request with a copy of his medication list, noting that his ibuprofen prescription was to run from November 25, 2022 until November 10, 2023. Id. at ¶89. Thompson agreed that the provider's note reflected the period asserted by the plaintiff, but she again confirmed that the medication order had been updated to end on December 23, 2022. Id. at ¶90. Thompson explains that given the plaintiff's continued complaints about ibuprofen, she also confirmed that he had other medications available to him for pain relief. Id. at ¶91. Specifically, she confirmed that he had a prescription for acetaminophen, and that she knew he was able to supplement his prescriptions with medications purchased from canteen. Id. at ¶92-94. Thompson responded to the plaintiff with this information. Id. at ¶95. This was the last interaction the plaintiff had with any of the defendants prior to filing this lawsuit on January 3, 2023. Dkt. No. 1.

**III. Analysis**

    A.   <u>Summary Judgment Standard</u>

    "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a); <u>see also</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324 (1986); <u>Ames v. Home Depot U.S.A., Inc.</u>, 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." <u>See</u> <u>Anderson</u>, 477

U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be, or is, genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

B.    Discussion

Although the voluminous summary judgment filings would suggest otherwise, the issues in this case are straightforward and uncomplicated: For some unspecified period and for some unspecified reason, the plaintiff received—at no cost to him—180, 500 mg tablets of Tylenol every thirty days. It is not clear from the record why he had a seemingly never-ending prescription to take such a high daily dosage of Tylenol, but it appears that his circumstances were not unique among incarcerated patients. Following a review of prescription patterns throughout DOC institutions, the committee determined that providers were over-prescribing over-the-counter medications

16

to the potential detriment of their patients' health. As the plaintiff himself acknowledges, providers prescribed Tylenol as a "cure-all" even though it is intended to be a temporary pain reliever for minor aches and pains. The plaintiff also suggests that providers found it easier to give incarcerated individuals over-the-counter pain medication to address the symptoms of an underlying condition rather than make efforts to resolve the underlying condition.

At least to some extent, the committee appears to have agreed with the plaintiff's concerns. The committee imposed new limits on prescriptions of over-the-counter medications to bring prescriptions in line with community standards, to protect the long-term health of incarcerated individuals and to encourage providers to focus on resolving underlying conditions rather than simply addressing the pain symptoms of those conditions. While these motivations are noble in theory, implementing a policy reflecting these motivations required a sharp pivot from providers' prior prescribing practices. And, as is clear from this case, it impacted incarcerated individuals whose providers had prescribed high dosages of over-the-counter medications for chronic use.

The plaintiff asserts that the defendants demonstrated deliberate indifference when they abruptly limited the dosage of Tylenol that his provider had prescribed, reducing the allowed dosage from 180, 500 mg tablets every thirty days to 50, 500 mg tablets every thirty days. According to the plaintiff, this abrupt reduction caused him significant pain and suffering. "[T]he Eighth

Amendment, as the Supreme Court has interpreted it, protects prisoners from prison conditions that cause the wanton and unnecessary infliction of pain, including . . . grossly inadequate medical care." Gabb v. Wexford Health Sources, Inc., 945 F.3d 1027, 1033 (7th Cir. 2019) (quoting Pyles v. Fahim, 771 F.3d 403, 408 (7th Cir. 2014)) (internal quotations omitted). The court uses a two-part test to evaluate whether medical care amounts to cruel and unusual punishment: it asks: 1) "whether a plaintiff suffered from an objectively serious medical condition" and 2) "whether the individual defendant was deliberately indifferent to that condition." Id. (quoting Petties v. Carter, 836 F.3d 722, 727-28 (7th Cir. 2016) (en banc)).

The defendants do not dispute that the plaintiff suffered from an objectively serious medical condition,[4] so the only issue before the court is whether a jury could reasonably conclude that the defendants were deliberately

---

[4] Although the parties do not dispute that the plaintiff suffered from an objectively serious condition, it is not clear why the plaintiff had a long-standing order for such a high daily dosage of Tylenol. The plaintiff agrees that he has a medical history of coronary artery disease, chest pain, chronic back pain, GERD, hyperlipidemia, hypothyroidism, mild hypertension, morbid obesity, neurogenic bladder, persistent depressive disorder, posttraumatic stress disorder, presbyopia OU, shortness of breath and spinal stenosis. Dkt. No. 100 at ¶14. But he also states, "At no time in this lawsuit has [the plaintiff] stated his back, testicles or knee pain were chronic pain. My back pain was due to the L4-L5 bilateral nerve impingement which is what caused the testicle pain . . . ." Dkt. No. 96 at ¶13. Steffanides saw the plaintiff for complaints of knee pain on April 12, 2022, about a week after the policy at issue took effect, see Dkt. No. 100 at ¶27, and according to medical records, in late-August or early-September 2022 the plaintiff complained about a flare-up in back pain that extended to his testicle, see Dkt. No. 100 at ¶¶38-39, months after the policy took effect. It does not appear that a provider prescribed a high dosage of Tylenol to address any of the pain complaints or conditions the plaintiff highlights in this lawsuit.

18

indifferent to that condition. The court finds thta no jury could reasonably reach such a conclusion and the defendants are entitled to summary judgment.

1. *No jury could reasonably conclude that Dr. LaVoie was deliberately indifferent to the plaintiff's complaints of pain.*

According to the plaintiff, LaVoie demonstrated deliberate indifference to the plaintiff's complaints of pain when LaVoie abruptly limited the amount of Tylenol the plaintiff's provider could prescribe in a thirty-day period. But the plaintiff mischaracterizes both the policy at issue and the motivations giving rise to the change in policy. As LaVoie explains, although the policy does generally limit the amount of Tylenol a provider can prescribe in a thirty-day period, the policy also allows providers to prescribe a dosage that exceeds the policy limits if the provider determines that a particular individual has a medical need for a higher dosage.

Further, contrary to the plaintiff's persistent but unsupported accusations that the policy was implemented to save money, see, *e.g.*, Dkt. No. 111 at ¶11; Dkt. No. 113 at ¶¶90-91, LaVoie explains that, following a review of providers' prescribing practices, the committee became concerned with the potential health issues posed by the chronic use of high dosages of over-the-counter medications—including Tylenol—which appeared to be common among incarcerated patients—which included the plaintiff. The committee also recognized that allowing incarcerated patients to have excessive amounts of medication might increase the opportunity for overdosing and might increase the risk of abuse. The committee determined that for the welfare of the

incarcerated patients, it was necessary to reduce the maximum dosage a provider could prescribe without scrutiny, with flexibility for a provider to exceed the policy limits when the provider determined it was medically necessary for a particular incarcerated patient.

Given the committee's thorough review of prescribing practices, the committee's well-supported conclusions based on its review and the flexibility the committee granted providers to deviate from the policy whenever they determined deviation was medically necessary, no jury could reasonably conclude that LaVoie was deliberately indifferent to the plaintiff's complaints of pain when LaVoie communicated the committee's policy changes. The plaintiff disagrees with the policy changes, but his disagreement, which is unsupported by any evidence suggesting the committee made its decisions for reasons other than those explained by LaVoie, is insufficient to create a triable issue. See Pyles v. Fahim, 771 F.3d 403, 409 (7th Cir. 2008) (holding that a "[d]isagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation."). LaVoie is entitled to summary judgment.

> 2. *No jury could reasonably conclude that Dr. Steffanides was deliberately indifferent to the plaintiff's complaints of pain.*

The plaintiff also asserts that Steffanides was deliberately indifferent to his knee, back and testicle pain when Steffanides refused to deviate from the new policy limits and provide the plaintiff with the same amount of Tylenol he had been receiving prior to the policy change. No jury could reasonably reach

that conclusion. The Constitution does not entitle the plaintiff to demand specific medical care, and, as stated above, courts have long held that "[m]ere dissatisfaction or disagreement with a doctor's course of treatment is generally insufficient" to support a claim under the Eighth Amendment. Johnson v. Doughty, 433 F.3d 1001, 1013 (7th Cir. 2006) (citations omitted). The facts that the plaintiff demanded more Tylenol, and that Steffanides did not comply with the plaintiff's demand, are not sufficient to show that Steffanides was deliberately indifferent to the plaintiff's pain.

To create a triable issue, the plaintiff needed to present evidence allowing a jury could reasonably conclude that Steffanides's subjective response to the plaintiff's complaints of pain "was so inadequate that it demonstrated an absence of professional judgment, that is, no minimally competent professional would have so responded under the circumstances." Collignon v. Milwaukee County, 163 F.3d 958, 989 (7th Cir. 1998). The plaintiff has not presented such evidence. The record shows that Steffanides first examined the plaintiff for complaints of knee pain on April 12, 2022. In response to the plaintiff's complaints that his current medications were offering little relief, Steffanides prescribed a Medrol Dosepak and ordered an x-ray. The plaintiff asserts that he learned of the policy change a few days later, when staff denied his request to reorder his Tylenol.

While not entirely clear, it appears that the plaintiff did not interact with Steffanides again until June 23, 2022, when Steffanides met with the plaintiff to discuss the results of the x-ray and to administer, at the plaintiff's request, a

21

cortisone injection. The plaintiff continued to receive Tylenol (albeit at a lower dosage), Celebrex and ice. About a month later, Steffanides ordered muscle rub, and two weeks after that, he ordered Voltaren gel in response to the plaintiff's complaints of continued pain. In late August or early September, after the plaintiff injured his back while exercising, Steffanides first prescribed Lidocaine topical cream. Then, after an examination of the plaintiff, Steffanides prescribed a muscle relaxer and a Medrol Dosepak. He also ordered an x-ray and made plans to order an MRI if the plaintiff's symptoms did not improve in four to six weeks with conservative treatment. When the plaintiff's symptoms did not improve within that timeframe, Steffanides prescribed another muscle relaxer and a Medrol Dosepak for pain, and he made a referral for an MRI. Then, after the plaintiff continued to complain of pain while he waited for the MRI, Steffanides prescribed Voltaren gel and, shortly thereafter, ibuprofen. The plaintiff had the MRI a couple of weeks before he filed this lawsuit.

Considering the totality of Steffanides' care for the plaintiff, no jury could reasonably conclude that Steffanides was deliberately indifferent to the plaintiff's pain. Steffanides was consistently responsive to the plaintiff's complaints, prescribing gels, creams and medications, administering injections and ordering diagnostic testing. The plaintiff appears to suggest that if only Steffanides had restored his Tylenol prescription to the pre-policy change levels, all his pain would have resolved. This suggestion is pure speculation. See Gabb v. Wexford Health Sources, Inc., 945 F.3d 1027, 1033 (7th Cir. 2019) (holding that plaintiff experienced no harm because he provided "no evidence

that *any* course of treatment . . . would have provided him relief from his chronic back pain").

In any event, "the Eighth Amendment does not entitle incarcerated patients to their preferred pain medication, nor does it impose the unrealistic requirement that doctors keep patients completely pain-free." Arce v. Wexford Health Sources Inc., 75 F.4th 673, 681 (7th Cir. 2023). This is not a case where a provider failed to provide any pain relief whatsoever or refused to respond to a patient's complaints of persistent pain. The record shows the opposite and lacks any evidence that would permit a jury to conclude that Steffanides's response to the plaintiff's was so "blatantly inappropriate" that it demonstrated deliberate indifference. Steffanides is entitled to summary judgment.

> 3. *No jury could reasonably conclude that Health Services Manager Thompson or Nurses Fryczynski and Barter were deliberately indifferent to the plaintiff's complaints of pain.*

Thompson, Fryczynski and Barter's involvement in the plaintiff's claims was quite limited. These defendants provided no direct care to the plaintiff. They had no authority to prescribe medication, override a provider's orders or deviate from Bureau of Health Services policy. See Dkt. No. 68 at ¶¶9-10; Dkt. No. 107 at ¶¶7-9. In relation to this lawsuit, all these defendants did was triage and/or respond to the plaintiff's health services requests after reviewing his medical records, the provider's orders and the relevant policies. They then presented the plaintiff with relevant information regarding policy changes, his

current prescriptions, his opportunities to supplement his prescriptions[5] and any upcoming appointments he had with a provider who could modify his prescriptions. No jury could reasonably conclude that their limited but diligent efforts to keep the plaintiff informed demonstrated deliberate indifference to his serious concerns.

The plaintiff insists they could have done more—given him "acute" amounts of acetaminophen, contacted his provider or scheduled an immediate appointment for an emergency consultation. See, e.g., Dkt. No. 113 at ¶5, 11-12. But, as the Seventh Circuit long ago explained, "[p]ublic officials do not have a free-floating obligation to put things to rights, disregarding rules . . . along the way. Bureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job." Burks v. Raemisch, 555 F.3d 592, 595 (7th Cir. 2009). This is because "people who stay within their roles can get more work done, more effectively, and cannot be hit with damages under § 1983 for not being ombudsmen." Id. Thompson, Fryczynski and Barter did not ignore the plaintiff's concerns. They assessed his needs based on the information in his health services requests, confirmed that he was under a provider's care and receiving medication for pain and responded with relevant information and

---

[5] The defendants explain that the plaintiff was free to supplement the pain medication his providers prescribed by purchasing over-the-counter medication at canteen. The fact that the plaintiff had the opportunity to purchase medication at canteen did not relieve the defendants of their obligation to adequately address his complaints of pain in the first place. Although this information may have been helpful for the plaintiff to know, it is irrelevant to the determination of whether the defendants' responses demonstrated deliberate indifference to his pain.

resources. This is all the Constitution required of them. See, *e.g.*, Berry v. Peterman, 604 F.3d 435, 440 (7th Cir. 2010) (explaining that an official who is working in an administrative capacity and consults with medical staff, forwards concerns, and timely responds to complaints does not violate the Constitution because officials may defer to the judgment of the providers who are treating a patient without fear of liability). Thompson, and Fryczynski and Barter are entitled to summary judgment.

## IV. Conclusion

The court **GRANTS** the defendants' motions for summary judgment. Dkt. Nos. 62, 67, 81.

The court **DENIES** the plaintiff's motion to strike. Dkt. No. 115.

The court **ORDERS** that this case is **DISMISSED**. The clerk will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. See Federal Rules of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Fed. Rule of App. P. 4(a)(5)(A). If the plaintiff appeals, he will be liable for the $605 appellate filing fee regardless of the outcome of the appeal. If the plaintiff seeks to proceed on appeal without prepaying the appellate filing fee, he must file a motion *in this court.* See Fed. R. App. P. 24(a)(1). The plaintiff may be assessed

a "strike" by the Court of Appeals if it concludes that his appeal has no merit. If the plaintiff accumulates three strikes, he will not be able to file a case in federal court (except a petition for *habeas corpus* relief) without prepaying the full filing fee unless he demonstrates that he is in imminent danger of serious physical injury. Id.

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Rule 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. See Fed. R. Civ. P. 6(b)(2). Any motion under Rule 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. See Fed. R. Civ. P. 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 27th day of March, 2025.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**

26